HONORABLE RICHARD A. JONES

UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
AT SEATTLE

DOUGLAS SHEPHERD, et al.,

       Plaintiffs,

    v.

WELDON MEDIATION SERVICES,
INC., et al.,

       Defendants.

CASE NO. C10-1217RAJ

ORDER

## I.  INTRODUCTION

This matter comes before the court on a motion calendar (Dkt. # 159) that the court created in its September 24, 2012 order.  That motion calendar addresses six motions for summary judgment.  The ultimate result of this order will be to terminate that motion calendar and to enter judgment in accordance with this order.  Nonetheless, the remainder of this order refers to the summary judgment motions that preceded the motion calendar.

For the reasons stated below, the court grants in part and denies in part the cross-motions regarding Defendants' grievance procedures.  Dkt. ## 120, 127.  The court denies Plaintiffs' motion regarding Defendants' policies for tenants with limited English proficiency (Dkt. # 121) and grants Defendants' cross-motion on the same topic (Dkt. # 130).  The court grants Plaintiffs' motion regarding Plaintiff Khadija Bin's rent obligations (Dkt. # 122) and denies Defendants' motion on the same topic (Dkt. # 132).

ORDER – 1

The parties confirmed at oral argument that no issues remain for trial, and the court accordingly directs the clerk to enter a judgment and dismiss this case. This order concludes with a permanent injunction against the Seattle Housing Authority. The judgment shall incorporate that permanent injunction.

## II.    BACKGROUND

Plaintiffs are tenants in housing complexes that Defendant Seattle Housing Authority ("SHA") administers as well as the Resident Action Council ("RAC"), a non-profit organization representing SHA tenants. SHA is a "public housing agency" ("PHA") within the meaning of the United States Housing Act of 1937 ("Housing Act"), which is codified along with amendments beginning at 42 U.S.C. § 1437. SHA administers more than 6000 housing units for low-income residents. SHA manages other housing programs as well, including the Section 8 Housing Choice Program ("Section 8"), in which qualified persons receive a voucher that they use to subsidize market-rate rentals of privately-owned housing. This case, however, focuses on tenants in housing units that SHA owns and manages.

Each of the parties' remaining disputes centers on SHA grievance hearings and the procedures that govern them. The Housing Act mandates that PHAs provide tenants an opportunity to file grievances contesting most adverse actions. 42 U.S.C. § 1437d(k). A PHA-appointed officer must hear and decide those grievances. *Id.* Although many issues may be the subject of a grievance, among the most important are those that arise when SHA attempts to evict a tenant. For example, Plaintiff Khadija Bin twice requested grievance hearings to contest SHA's attempt to evict her for allegedly failing to disclose that her husband lived with her and for failing to pay rent.

Plaintiffs raise a host of their own grievances about SHA's grievance hearings. They contend that SHA improperly selects hearing officers without consulting resident organizations, that its procedures for scheduling grievance hearings violate the law, that it

ORDER – 2

provides inadequate means for tenants to obtain documentary evidence before grievance hearings or to compel the presence of witnesses, and that it fails to provide translations of grievance documents to tenants with limited English proficiency.  They also argue that SHA's hearing officers improperly refuse to consider legal arguments and improperly defer to the discretionary decisions of other SHA staff.  They request a declaratory judgment that these practices are unlawful and an injunction preventing SHA from continuing them.  Finally, in the aftermath of Ms. Bin's grievance hearings, Ms. Bin requests that the court enforce the decision that followed her most recent grievance hearing and enjoin SHA from attempting to evict her based on allegedly unpaid rent.

The court addressed some of Plaintiffs' arguments in February 2011 when it granted their motion for a preliminary injunction preventing SHA from "[c]onducting grievance hearings in which hearing officers decline to consider arguments based on applicable federal, state, or local law," and from allowing any officer not trained to address legal arguments from presiding over grievance hearings.  Feb. 9, 2011 ord. (Dkt. # 47) at 24.  Among other things, the court rejected as a matter of law SHA's contention that the Housing Act and regulations implementing it permitted grievance officers to ignore legal arguments.  The court also ruled that the regulations obligated SHA to consult with resident organizations before appointing hearing officers.

In the aftermath of the February 2011 order, the parties engaged in contentious discovery and prepared to file motions for summary judgment.  The parties requested leave to file a total of six summary judgment motions, recognizing that this District's Local Rules presumptively limit each party to a single summary judgment motion.  Local Rules W.D. Wash. CR 7(d).  At the court's direction, the parties met and conferred to ensure that they agreed in advance on what issues would be in dispute in the summary judgment motions.  That discussion led to a stipulation in which Plaintiffs agreed that they did not "intend to pursue any claims other than those appearing in their forthcoming

ORDER – 3

summary judgment motions" and that "[a]ny claims not appearing in the Plaintiffs' summary judgment motions . . . are no longer advanced and should therefore be dismissed." Feb. 10, 2012 stip. (Dkt. # 108) ¶¶ 1, 8. After the court issued an order with additional guidance on the summary judgment briefing, the parties entered a second stipulation. It reiterated that Plaintiffs did not "intend to pursue any claims other than those appearing in their forthcoming summary judgment motions," declared that SHA did not "need to respond to anything that is not raised in Plaintiff's opening motions," and that "claims not raised by Plaintiffs in their opening briefs will be deemed to have been abandoned." Feb. 14, 2012 stip. (Dkt. # 110) ¶¶ 1, 4.

After the parties completed briefing on the six summary judgment motions, they announced a partial settlement. Mar. 28, 2012 Settlement Agr. (Dkt. # 148-1, Ex. A). That settlement disposed of all claims relating to SHA's Tenant Trust Account program, including Plaintiff Komba Ngauja's individual claim relating to the program. In addition, SHA agreed to waive a dispute arising from a plumbing bill it issued to Plaintiff Douglas Shepherd. In the wake of the partial settlement, the only individual Plaintiff with an unresolved dispute is Ms. Bin.

On September 24, the court issued an unsigned order reflecting its likely decision on the six summary judgment motions. The court set oral argument to hear the parties' views on the unsigned order. The court held oral argument on October 23. In many respects, the parties did not address the unsigned order. For example, no party mentioned the court's disposition of Ms. Bin's claims. Other claims received little attention. The parties did not convince the court to change substantially any portion of the unsigned order. The remainder of this order is essentially identical to the unsigned order.

The court now considers Plaintiffs' remaining claims as Plaintiffs articulate them in their three summary judgment motions. The court will first consider Plaintiffs' challenges to SHA's grievance hearing policies and procedures. It will then address

ORDER – 4

Plaintiffs' effort to compel SHA to provide foreign-language translations of grievance-related documents.  Finally, the court will examine Ms. Bin's individual dispute over her allegedly unpaid rent.

### III.   ANALYSIS

On a motion for summary judgment, the court must draw all inferences from the admissible evidence in the light most favorable to the non-moving party.  *Addisu v. Fred Meyer, Inc.*, 198 F.3d 1130, 1134 (9th Cir. 2000).  Summary judgment is appropriate where there is no genuine issue of material fact and the moving party is entitled to a judgment as a matter of law.  Fed. R. Civ. P. 56(a).  The moving party must initially show the absence of a genuine issue of material fact.  *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986).  The opposing party must then show a genuine issue of fact for trial. *Matsushita Elect. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986).  The opposing party must present probative evidence to support its claim or defense.  *Intel Corp. v. Hartford Accident & Indem. Co.*, 952 F.2d 1551, 1558 (9th Cir. 1991).  The court defers to neither party in resolving purely legal questions.  *See Bendixen v. Standard Ins. Co.*, 185 F.3d 939, 942 (9th Cir. 1999).

### A.   Plaintiffs' Claims Regarding SHA Grievance Procedures and Policies.

In their motion addressing SHA's grievance hearings, Plaintiffs seek a permanent injunction with the following provisions:

1) a requirement that SHA hearing officers address legal arguments at grievance hearings, including a prohibition on the use of hearing officers who are not qualified to address legal arguments;

2) a requirement that SHA hearing officers not defer to the discretionary judgments of SHA staff;

3) a requirement that SHA use hearing officers, rather than SHA staff, to schedule grievance hearings and resolve disputes over the schedule, and that SHA provide a means for tenants to raise scheduling disputes with the hearing officer prior to the hearing;

ORDER – 5

4)   a requirement that SHA enable tenants to use a subpoena-like form of compulsory process to compel the production of documents or witnesses for grievance hearings; and

5)   a requirement that SHA consult resident organizations before appointing grievance hearing officers and issue written procedures governing that consultation.

Plaintiffs also ask the court to appoint a special master to review SHA's past grievance decisions.

The court addressed the statutory and regulatory framework for grievances in its February 2011 order.  To reiterate, the Housing Act empowers the Secretary of the Department of Housing and Urban Development ("HUD") to promulgate regulations establishing grievance procedures:

The Secretary shall by regulation require each public housing agency receiving assistance under this chapter to establish and implement an administrative grievance procedure under which tenants will—

(1)   be advised of the specific grounds of any proposed adverse public housing agency action;

(2)   have an opportunity for a hearing before an impartial party upon timely request within any period applicable under subsection (l) of this section;

(3)   have an opportunity to examine any documents or records or regulations related to the proposed action;

(4)   be entitled to be represented by another person of their choice at any hearing;

(5)   be entitled to ask questions of witnesses and have others make statements on their behalf; and

(6)   be entitled to receive a written decision by the public housing agency on the proposed action.

42 U.S.C. § 1437d(k).  The Secretary has exercised HUD's statutory authority in eight grievance regulations.  24 C.F.R. §§ 966.50-966.57.  Among them is a requirement that each PHA implement its own grievance procedures, incorporate those procedures in

ORDER – 6

1    every tenant's lease, provide a copy of the grievance procedure to tenants and resident

2    organizations, and provide notice and an opportunity to comment before changing the

3    grievance procedure.  24 C.F.R. § 966.50.   SHA's grievance procedure manual (Dkt.

4    # 18-2, "SHA Gr. Man.") largely mimics the HUD regulations.

5         The court now considers Plaintiffs' claims that various aspects of SHA's

6    grievance process violate the Housing Act and HUD's grievance regulations.  With the

7    exception of the issues the court addresses in Part III.A.4, *infra*, the court does not

8    consider any claim that SHA's grievance procedures violate the Due Process Clause of

9    the Fourteenth Amendment; Plaintiffs did not articulate any other Due Process claim in

10   their summary judgment motion.  In accordance with the stipulations they signed before

11   filing that motion, Plaintiffs waived all other Due Process Clause claims.

12        **1.      SHA Grievance Hearing Officers Must Resolve Legal Arguments.**

13        The court ruled in February 2011 that SHA's grievance officers cannot ignore

14   legal arguments that tenants present at grievance hearings.  With a second chance to

15   convince the court otherwise, SHA has largely avoided the court's reasoning.  The court

16   now reiterates its conclusion that grievance officers must consider tenants' legal

17   arguments, addressing SHA's new arguments along the way.

18        The Housing Act gives the tenant a broad right to grieve "any proposed adverse

19   public housing agency action."  42 U.S.C. § 1437d(k)(1).  HUD's regulations in turn

20   permit a grievance over "any dispute which a tenant may have with respect to PHA

21   action or failure to act in accordance with the individual tenant's lease or PHA

22   regulations which adversely affect the individual tenant's rights, duties, welfare or

23   status."  24 C.F.R. § 966.53(a).[1]  Tenants' substantive rights arise not only under federal

24   law, but under applicable state and local law as well.  *See Hous. Auth. of Everett v. Terry*,

---

[1] The only disputes categorically beyond the scope of the grievance procedure are those
"between tenants not involving the PHA" and "class grievances."  24 C.F.R. § 966.41(b)
(declaring that the "grievance procedure is not intended as a forum for initiating or negotiating
policy changes between a group or groups of tenants and the PHA's Board of Commissioners").

ORDER – 7

789 P.2d 745, 749-50 (Wash. 1990) (holding that federal law did not preempt requirements of Washington Residential Landlord-Tenant Act ("RLTA") or Unlawful Detainer Act); *SHA v. Silva*, 972 P.2d 952, 955 (Wash. Ct. App. 1999) (finding SHA bound by Seattle Municipal Code).  SHA recognizes its obligation to comply with Washington and local law.  Its written policies require it to comply with "all federal, state and local laws and with the rules and regulations governing landlord-tenant relations." SHA Manual, L12.3-1 (available at http://www.seattlehousing.org/residents/pdf/12-3-1_Vacating.pdf).  More specific regulations require it to abide by Washington law and Seattle law when evicting tenants.  SHA Op. Man., L12.4-1 (available at http://www.seattlehousing.org/residents/pdf/12-4-1_Evictions.pdf).

If a tenant has a dispute about an adverse SHA action, that dispute may well be legal.  For example, a tenant might not contest his failure to pay rent on time, but argue that he cannot be evicted because the SHA did not provide the pre-eviction notice that the Washington Unlawful Detainer Act requires.  RCW § 59.12.030(3).  This is a legal argument – it requires the person resolving it to understand applicable law and its requirements.  A tenant has a right to raise that legal argument.  To take another example, if a tenant "commits or permits waste" or "carries on . . . any unlawful business" or permits a "nuisance," she can be evicted without an opportunity to cure.  RCW § 59.12.030(5).  Nothing prohibits a tenant from arguing that she did not commit waste or engage in an unlawful business or engage in a nuisance, but those are legal arguments in that they require the person resolving them to understand what "nuisance," "waste," and "unlawful business" mean under the law.  Although the regulations permit a tenant to raise these legal arguments, SHA contends, implausibly, that its hearing officers are entitled to ignore them.

SHA misfires in its efforts to give statutory or regulatory support for the notion that its hearing officers can ignore legal arguments.  It seizes upon a regulation that

ORDER – 8

requires the hearing officer to make a decision "based solely and exclusively on the *facts* presented at the hearing." 24 C.F.R. § 966.56(b)(5) (emphasis added). SHA misunderstands the provision, which merely prohibits hearing officers from considering facts that are not presented at the hearing. It would prohibit, for example, a hearing officer from considering her post-hearing conversation with a SHA property manager in deciding a grievance. Neither a hearing officer nor any adjudicator can make a decision based exclusively on "facts." The "fact" that a tenant has not paid her rent, for example, is meaningless without an understanding of the law that requires a tenant to pay rent. SHA implicitly admits as much when it concedes that its hearing officers may consider SHA rules in rendering decisions. SHA Mot. (Dkt. # 127) at 8-11. If a hearing officer can consider only "facts," how can she consider "rules"? And where SHA's rules explicitly incorporate federal, state, and local law, how can hearing officers ignore arguments based on that law? SHA provides no answer to these questions. The court already remarked in its February 2011 order that SHA's hearing officers explicitly and implicitly consider SHA's legal arguments; they simply refuse to consider *tenants'* legal arguments. Feb. 9, 2011 ord. (Dkt. # 47) at 15-16, 18. Indeed, in Ms. Bin's most recent grievance hearing, SHA's general counsel prepared a "legal memorandum" for SHA's property manager to submit to the hearing officer. This is a curious approach for an agency that insists that its hearing officers cannot consider legal arguments.

SHA continues to wrongfully assert that its hearing officers should consult with SHA's legal department when confronted with a legal issue. SHA Mot. (Dkt. # 127) at 10. Only hearing officers can decide grievances. SHA's legal judgment becomes relevant only after an officer's written grievance decision, after which SHA may "within a reasonable time" inform the officer and the tenant either that the tenant's complaint was beyond the scope of the grievance process or that the hearing officer's decision is "contrary to applicable Federal, State or local law." 24 C.F.R. § 966.57(b)(1)-(2). *See*

ORDER – 9

Feb. 9, 2011 ord. (Dkt. # 47) at 17 n.2 (observing that the evidence showed that SHA did not have a policy of consulting with hearing officers about legal arguments, and that such a policy would violate the law in any event). This provision allows the SHA to avoid a hearing officer's determination in some circumstances, it does not permit the hearing officer to ignore legal arguments.

For these reasons and the reasons stated in the February 2011 order, the court concludes that SHA's hearing officers must, as a matter of law, resolve legal arguments at grievance hearings. SHA asserts that if hearing officers must resolve legal arguments, only lawyers can be hearing officers. SHA is mistaken. It must merely appoint hearing officers who are trained to consider and resolve the legal issues that typically arise in grievance hearings. SHA can appoint lawyers or laypeople to serve as hearing officers; it may not, however, instruct its hearing officers to ignore legal arguments or appoint hearing officers who lack the training or experience to resolve them.

### 2.   The Law Does Not Empower Hearing Officers to Second-Guess SHA's Discretionary Decisions to Take Adverse Actions Against Tenants.

Plaintiffs also contend that SHA's hearing officers wrongly refuse to review the discretionary decisions of SHA staff (typically its property managers) in grievance hearings. Plaintiffs focus on discretionary decisions that lead to eviction, noting that SHA property managers can decide not to evict a tenant even where they have legal grounds to do so. Plaintiffs illustrate that uncontroversial point with two grievance decisions in which SHA property managers decided to evict families who had violated their leases. In each case, a family allowed a family member who was not on the family's lease to live with them. In each case, the family member's presence caused disruptions. In each case, the family presented mitigating circumstances relating to their financial situation and their attempts to remedy the disruption. In each case, the SHA property manager nonetheless decided to commence eviction proceedings. At the grievance hearings, the hearing officer heard testimony about the mitigating

ORDER – 10

circumstances.  He based his decisions, however, solely on whether SHA had a legal basis to evict the tenant.

Plaintiffs offer no legal basis for the discretionary review they propose.  They point to 24 C.F.R. § 5.852 as a source of property managers' discretion.  That regulation, however, does not apply to PHAs or their property managers.  24 C.F.R. § 5.850(b).  They also point to cases interpreting regulations on PHAs' authority to terminate Section 8 vouchers.  Those regulations are fundamentally different than the regulations governing public housing grievances.[2]

Section 8 regulations inform PHAs that before terminating a voucher, they "may consider all relevant circumstances such as the seriousness of the case, the extent of participation or culpability of individual family members, mitigating circumstances relating to the disability of a family member," and more.  24 C.F.R. § 982.552(c)(2)(i).  Critically, Section 8 regulations also require that in the event the tenant requests a hearing to contest a voucher termination, the hearing officer must make "[f]actual determinations relating to the individual circumstances of the family . . . based on a preponderance of the evidence presented at the hearing."  24 C.F.R. § 982.555(e)(6).  In other words, the regulations that apply to Section 8 hearings do not merely require the hearing officer to consider the same mitigating circumstances as the PHA, they arguably require the hearing officer to make her own determination based on those mitigating circumstances.  Courts have reached a variety of conclusions as to what a Section 8 hearing officer must do to honor these regulations.  *E.g.*, *Robinson v. D.C. Hous. Auth.*, 660 F. Supp. 2d. 6, 17 (D.D.C. 2009) (holding that hearing officer has no obligation to address mitigating circumstances); *Bowman v. City of Des Moines Mun. Hous. Agency*, 805 N.W.2d 790, 799 (Iowa 2011) (following *Robinson*, "at least where circumstances indicate the hearing

---

[2] Although the Section 8 program is a form of public housing, the court uses the phrase "public housing" in this section to distinguish Section 8 regulations from regulations governing grievances in PHA-owned housing.

ORDER – 11

officer was aware of his or her discretion to consider [mitigating] factors"); *Carter v. Lynn Hous. Auth.*, 880 N.E.2d 778, 786 (Mass. 2008) (holding that hearing officer's decision must "reflect factual determinations relating to the individual circumstances of the family . . . , demonstrate that he is aware of his discretionary authority . . . , and indicate whether he either did or did not choose to exercise that discretion in favor of mitigating the penalty").

HUD regulations on public housing grievances are markedly different than those governing the Section 8 program. The grievance regulations require neither PHAs nor grievance hearing officers to consider mitigating circumstances.[3] Whereas the Section 8 regulations discuss the consideration of "relevant circumstances," no generally applicable public housing regulation does. Plaintiffs point to 24 C.F.R. § 966.4(l)(5)(vii)(B), which informs the PHA that it "may consider all circumstances relevant to a particular case" when deciding whether to evict for criminal activity or drug abuse. 24 C.F.R. § 966.4(l)(5)(vii)(B). That regulation does not apply generally to other adverse actions by PHAs.[4] But regardless of whether PHA staffers have discretion in deciding whether to evict or take another adverse action, the grievance regulations differ because, unlike the Section 8 regulations, there is no companion regulation that suggests that grievance hearing officers must also consider the same circumstances as PHA staff. Few courts have considered 24 C.F.R. § 966.4(l)(5)(vii)(B). So far as the court is aware, none of them have held that it gives grievance hearing officers authority to review PHAs' discretionary decisions outside the Section 8 context. In *Stevens v. Hous. Auth. of S.*

---

[3] HUD may have had reasons for requiring more extensive administrative review in the Section 8 context. In public housing evictions, a grievance hearing is only the first step to eviction. By contrast, a PHA need not seek relief in state court before terminating a Section 8 voucher.

[4] The court does not suggest that PHA's lack discretion to consider mitigating circumstances when deciding whether to evict a tenant. Indeed, HUD tells PHAs that they must consider those circumstances in any eviction. 56 Fed. Reg. 51560, ¶ 3.3.3 ("Where there are proper grounds for eviction—for criminal activity by household members or for some other ground—the decision when and whether to evict is a discretionary management judgment by the individual PHA.").

ORDER – 12

*Bend*, 720 F. Supp. 2d 1013, 1032 (N.D. Ind. 2010), the court found that "the law clearly establishes that the decision to actually consider those factors lies in the sole discretion of the housing authority."  A New Jersey state court, considering the application of 24 C.F.R. § 966.4(l)(5)(vii)(B) to a Section 8 tenant facing eviction, held that the regulation required it to decide "whether a Section 8 landlord has exercised its discretion in a manner consistent with federal statute."  *Newark Hous. Auth. v. Martinez-Vega*, 34 A.3d 1271, 1274 (N.J. Super. 2012).

The only regulation that is generally applicable to the discretionary decisions that precede public housing evictions is 24 C.F.R. § 966.4(l)(2), which states that a PHA "may terminate [a] tenancy only for" enumerated reasons, including nonpayment of rent, lease violations, and more. Unlike the regulations the court has just addressed, it does not provide a list of "relevant circumstances" for PHAs to consider when deciding whether to evict.  Unlike Section 8 regulations, no companion regulation suggests that grievance hearing officers must consider "relevant circumstances," or even that they may consider any discretionary aspect of a PHA's decision.  For that reason, the court concludes that grievance hearing officers are not empowered to review a PHA's discretionary decision to evict.

The court notes that in *Bennington Hous. Auth. v. Bush*, 933 A.2d 207, 212 (Vt. 2007), the Supreme Court of Vermont engaged in abuse-of-discretion review of a PHA's decision to evict a public housing tenant.  No grievance hearing was at issue.  The *Bush* court did not explain why abuse-of-discretion review was appropriate, and this court disagrees with that approach for the reasons it has already stated.  Critically, however, the *Bush* court's approach is nothing like the one Plaintiffs advocate.  The *Bush* court applied traditional abuse-of-discretion review, wherein it could overturn the PHA's discretionary decision only if the PHA failed to exercise discretion, applied the wrong law, or made arbitrary and capricious findings.  *Id.* at 210, 213.  In traditional abuse-of-discretion

ORDER – 13

review, a court cannot substitute its judgment for the judgment of the original decisionmaker.  *See*, *e.g.*, *Fence Creek Cattle Co. v. United States Forest Serv.*, 602 F.3d 1125, 1132 (9th Cir. 2010) (conducting abuse-of-discretion review under Administrative Procedures Act, noting that "[w]e must be careful not to substitute our judgment for that of the agency").  Plaintiffs, by contrast, explicitly ask this court to order SHA's hearing officers to substitute their judgment for the judgment of its property managers.  Pltfs.' Mot. (Dkt. # 120) at 13.  Even if the law supported abuse-of-discretion review of SHA's discretionary decisions, it would not support the relief Plaintiffs request.

### 3.    SHA Violates the Law By Prohibiting Hearing Officers From Deciding Disputed Requests for Continuances of Grievance Hearings.

When a tenant requests a grievance hearing, HUD regulations dictate that "a hearing shall be scheduled *by the hearing officer* or hearing panel promptly for a time and place reasonably convenient to both the complainant and the PHA."  24 C.F.R. § 966.55(f) (emphasis added).  SHA's grievance manual is virtually silent as to hearing scheduling policies.  SHA's unwritten policy is that a "hearing coordinator" makes the initial decision on the time and place of a grievance hearing.  It is not clear to what extent the coordinator solicits tenant or PHA input before doing so.  A tenant who prefers a different date or location can contact the coordinator, who will grant one continuance as a matter of course.  Thereafter, the coordinator addresses any request for continuance in her own discretion.  In some cases, she will discuss a continuance with SHA's legal department, who will make a final decision about the hearing time.  Hearing officers have no input into these decisions.  Because SHA does not inform a tenant in advance who will hear her grievance, a tenant has no way to contact the hearing officer regarding scheduling.  The only way that a tenant can obtain a hearing officer's decision on a scheduling matter is to appear at a scheduled hearing and request a continuance.  Until recently, SHA instructed its hearing officers that they had no authority to grant continuances.  In the wake of a court decision that hearing officers may not abdicate their

ORDER – 14

responsibility to decide scheduling questions, SHA has apparently informed its hearing

officers that they can grant continuances.  *See SHA v. Bin*, 260 P.3d 900, 902 (Wash. Ct.

App. 2011) (reviewing King County Superior Court ruling).

SHA's policy, which excludes hearing officers from most meaningful scheduling

decisions, violates the law.  The court has no quarrel with the SHA designating a hearing

coordinator to assign an initial hearing time, especially where its policy is to grant a

tenant a first continuance as a matter of course.  If these purely ministerial scheduling

procedures nonetheless result in a dispute about when the hearing should be held, the law

requires the hearing officer to decide that dispute.  SHA violates the law in two ways.

First, it prevents tenants from raising scheduling disputes with hearing officers by

preventing them from contacting the hearing officer other than by appearing at the

hearing.  A tenant who needs a continuance to accommodate a medical appointment, for

example, can take no comfort from a policy that requires her to miss the medical

appointment to appear personally to request a continuance.  Second, SHA allows staff

members other than the hearing officer to decide scheduling disputes, in plain violation of

the law.

SHA must remedy these deficiencies by implementing a procedure that allows the

tenant to present any *disputed* request for a continuance to the hearing officer for

resolution in advance of the scheduled hearing.  SHA can use staff members other than a

hearing officer to grant continuances where there is no dispute.

### 4.      SHA Need Not Provide Subpoena-Like Powers to Tenants in Grievance Proceedings; Compliance With HUD's Regulations Suffices.

HUD regulations allow tenants to examine the evidence against them in advance

of grievance hearings and to confront witnesses.  Before a grievance hearing, tenants can

"examine . . . any PHA documents, including records and regulations, that are directly

relevant to the hearing."  24 C.F.R. § 966.55(b)(1); *see also* 24 C.F.R. § 966.4(m).

Tenants can "confront and cross-examine all witnesses upon whose testimony or

ORDER – 15

information the PHA" relies.  24 C.F.R. § 966.55(b)(4).  In a grievance hearing addressing a dispute that will not result in eviction, a PHA is prohibited from relying on any document it does not produce to a tenant who requested it.  24 C.F.R. § 966.55(b)(1). In a grievance hearing that might result in an eviction, a PHA "cannot proceed with the eviction" if it does not produce all relevant documents that a tenant requests."  24 C.F.R. § 966.4(m).

Plaintiffs do not contest that SHA complies with these regulations, they argue instead that SHA must establish "subpoena procedures."  They apparently hope that the court will force SHA to use its own subpoena power[5] to issue subpoenas on behalf of tenants.  Plaintiffs offer just three paragraphs of argument to support their request.  They concede that HUD regulations do not require that tenants have subpoena power; they argue instead that Washington law requires subpoena power as a matter of due process. They point to *Mansour v. King County*, 128 P.3d 1241, 1248 (Wash. Ct. App. 2006), in which the court found that due process required that pet owners have access to evidence or witnesses when contesting orders to remove their pets.  Plaintiffs ignore that the plaintiff in *Mansour* had *no* option for compelling the production of documents or the appearance of witnesses, in sharp contrast to SHA tenants, who have all of the protections the court described above.  Plaintiffs offer no evidence of any case in which a tenant was at a disadvantage in a grievance hearing because she could rely only on the HUD-mandated procedures, as opposed to a subpoena for witnesses or documents.  Indeed, they do not offer even a hypothetical example.  They make no attempt to explain how the existing regulations and SHA policies are inadequate to ensure that tenants can examine documents and examine witnesses.  The court finds that compliance with HUD regulations regarding documents and witnesses is adequate to protect tenants' due process rights.

---

[5] RCW § 35.82.070(8) gives Washington PHAs the authority to establish administrative tribunals, and to establish subpoena procedures within those tribunals.

ORDER – 16

5.    **SHA Must Comply With HUD Regulations Regarding Consultation
With Resident Organizations Before Appointing Hearing Officers.**

The court noted in its February 2011 order that "HUD regulations unambiguously
require SHA to consider the input of tenants in selecting hearing officers."  Dkt. # 47 at
19.  The court relied on 24 C.F.R. §  966.55(b)(3), which mandates that a PHA "shall
consult the resident organizations before [the] appointment of each hearing officer" and
that it consider "comments or recommendations" from tenant organizations.  The court
awarded no injunctive relief at the time because Plaintiffs did not ask the court to require
SHA to select hearing officers in accordance with the regulations.  Since the February
2011 order, SHA has appointed a new hearing officer to hear public housing grievances.
SHA neither consulted any resident organization before the appointment nor solicited
comments or recommendations from resident organizations.

Plaintiffs seek an injunction that would require SHA to consider resident
organization input on future hearing officer appointments.  SHA has responded by
agreeing to consult with the Joint Policy Advisory Committee ("JPAC") on future
hearing officer selections.  Plaintiffs agree that consultation with JPAC is appropriate, but
they insist that the court order SHA to consult with JPAC, given SHA's persistent failure
to consult on past hearing officer appointments.  Plaintiffs also ask the court to give SHA
detailed instructions on the consultation process.

The motions before the court provide enough information for only a single ruling:
that SHA has violated the law by failing to consult with resident organizations on past
hearing officer appointments, and that SHA must engage in the required consultation in
the future.  The court agrees with Plaintiffs that SHA's voluntary assurance that it will
follow the law is insufficient in light of its past violations.  The court will issue an
injunction that requires SHA to consult with resident organizations on any future hearing
officer appointment and to issue rules to govern the consultation process.  Those rules

ORDER – 17

need only establish procedures for soliciting, receiving, and considering resident organization input in accordance with the law.

The court makes no finding as to a remedy for SHA's past violations of the law. Plaintiffs' opening brief made no argument as to a remedy for past violations, and they accordingly waived that argument.

### 6. The Court Will Not Appoint a Special Master to Review Past Grievance Decisions.

Plaintiffs overreach wildly by requesting that the court appoint a special master to review all past grievance proceedings that SHA and its hearing officers conducted in violation of HUD regulations. If there are legal remedies for errors made in prior grievance decisions, they belong to the tenant who brought the grievance. With the exception of the individual Plaintiffs in this lawsuit, Plaintiffs have not shown that they have the authority to represent any other tenant. The court will not order plenary review of past grievance decisions.

### B. Plaintiffs Have No Private Right of Action to Challenge SHA's Foreign-Language Translation and Interpretation Policies.

Plaintiffs demand changes in SHA's policies for making grievance documents available to tenants with limited English proficiency. No one disputes that about a quarter of SHA's tenants have limited English skills, including Ms. Bin, whose primary language is Somali. Currently, SHA translates no grievance documents for tenants like Ms. Bin, although it does provide foreign-language notices to accompany some grievance documents. The notices inform tenants that SHA staff will meet with them and, through an interpreter, explain the documents in the tenant's preferred language. SHA's practices are not good enough, in Plaintiff's view. They contend that SHA must provide written translations of many grievance documents.

Whatever the merits of the policy they prefer, Plaintiffs' language-access claim fails because they have no right to bring it. To understand this conclusion, the court

ORDER – 18

1  explains the Executive Branch machinations that led to SHA's interpretation and

2  translation policies.

3          In 2000, President Clinton signed Executive Order 13166, which required all

4  executive agencies to develop guidance to "improve access to federally conducted and

5  federally assisted programs and activities for persons who, as a result of their national

6  origin, are limited in their English proficiency (LEP) . . . ."  65 Fed. Reg. 159, 50121

7  (Aug. 16, 2000).  HUD was one of the agencies that developed LEP guidance for entities,

8  like SHA, who receive federal funding.  HUD completed its guidelines ("LEP

9  Guidance") in 2007.  72 Fed. Reg. No. 13, 2732-54 (Jan. 22, 2007).

10          The LEP Guidance contains detailed suggestions for developing LEP policies.

11  Among them is the suggestion that funding recipients document their LEP policies in a

12  written plan.  72 Fed. Reg. at 2745 (recognizing that some funding recipients might

13  choose not to adopt a written plan).

14          SHA adopted its Interpretation and Translation Policy ("Translation Policy") in

15  response to the LEP Guidance.  The Policy, which is part of SHA's Operations Manual,

16  is just two pages long.[6]  It declares that SHA will endeavor to identify which of its

17  tenants have language service needs, suggests several means of providing language

18  services, and declares its intent to employ interpreters where appropriate.  In the portion

19  that attracts Plaintiffs' attention, SHA states that it will translate "vital documents" into

20  "selected languages.  Trans. Policy at 2.  "Vital documents," in SHA's view, are those

21  that "if not understood, will result in the loss of housing."  *Id.*  SHA also states that it

22  "may" translate non-vital documents.  *Id.*

23          Plaintiffs contend that SHA does not follow its Translation Policy.  In practice,

24  SHA does not translate *any* vital document relating to the grievance process.  Instead,

25  when SHA sends a tenant a notice of an adverse action, the notice is invariably in

26

27  ───────────────
   [6] The Translation Policy is at Attachment 5 to the declaration of Plaintiffs' counsel.  Dkt. # 123.

28  ORDER – 19

English.  Rather than translate the document, SHA accompanies it with a notice that states, in sixteen languages, that the document is important and that the tenant can contact SHA for assistance with interpreting or explaining it.  For evictions, a second document explains in the same 16 languages that the document "notifies you that you are being evicted and explains your right to appeal."  If a tenant contacts SHA for an explanation of the document, SHA will schedule an appointment where one of its staff and an interpreter will orally explain the document to the tenant.  With the exception of a few standardized documents, SHA does not provide written translations.

Plaintiffs decry SHA's practices as inadequate and demand that it provide written translations of vital grievance documents, and that it at least give serious consideration to translating non-vital grievance documents.

The problem with Plaintiffs' claim is that they have no right to bring it.  Plaintiffs expressly disavow any claim based on Executive Order 13166 or the LEP Guidance. That is for the best, because the President and HUD expressly declared that no person could sue for a violation of the Executive Order or the LEP Guidance.  65 Fed. Reg. at 50122; 72 Fed. Reg. at 2752-53.  Plaintiffs similarly disavow any claim based on Title VI of the Civil Rights Act of 1964, which prohibits discrimination in federally-funded programs.  That is also for the best, because no one disputes that the Executive Order and the LEP Guidance invoke Section 602 of Title VI (42 U.S.C. § 2000d-1) which authorizes federal agencies to issue regulations to effectuate the prohibition of Section 601 (42 U.S.C. § 2000d) on discrimination in federally-funded programs.  No one argues that the failure to provide LEP services amounts to intentional discrimination, and HUD recognized that its LEP Guidance served to prevent disparate impact on protected groups. 72 Fed. Reg. at 2739.  In *Alexander v. Sandoval*, 532 U.S. 275, 293 (2001) the Supreme Court held that there is no private right of action to enforce Title VI disparate-impact

ORDER – 20

regulations.  Only regulatory violations that amount to intentional discrimination are actionable.  *Id.* at 284.

In their motion for summary judgment, Plaintiffs articulated just one potential source for their right to sue: SHA's Translation Policy itself.  To the extent they suggest that SHA is empowered, through its own policies, to create causes of action enforceable in court, Plaintiffs are mistaken.  The *Sandoval* Court noted that federal agencies could not create a cause of action via Title VI's rulemaking authority.  532 U.S. at 291 ("[I]t is most certainly incorrect to say that language in a regulation can conjure up a private cause of action that has not been authorized by Congress.").  If HUD is powerless to create a private cause of action to enforce the LEP Guidance, surely a PHA is no more able to do so.

Plaintiffs fare no better by citing Washington authority mandating that PHAs follow their own policies when evicting tenants.  See *Hous. Auth. v. Saylors*, 578 P.2d 76, 79 (Wash. Ct. App. 1978) ("The Housing Authority must also comply with HUD regulations and its own grievance procedure."); *Bin*, 260 P.3d at 902 (Wash. Ct. App. 2011) ("A housing authority must comply with federal regulations and its own grievance procedures before terminating a tenancy.") (citing *Saylors*).  The *Saylors* court considered grievance procedures that HUD's grievance regulations mandated.  The *Bin* court merely quoted *Saylors* in dicta summarizing the trial court's unchallenged dismissal of SHA's unlawful detainer action.  HUD's grievance regulations do not mandate the translation of grievance documents; they are wholly silent regarding accommodations for tenants with limited English.  SHA chose to agree to provide interpreters at grievance hearings in its grievance policy, SHA Gr. Man. Para. F., but HUD did not mandate that choice.  Given their use of the phrase "grievance procedure(s)," the court queries whether the *Bin* or *Saylors* courts had any view on whether PHAs must abide by internal policies other than their HUD-mandated grievance procedures.  Ultimately, the court need not

ORDER – 21

decide that issue, because it is plain that, at most, the *Saylors* court ruled that PHAs must follow their own procedures *before evicting tenants*. 578 P.2d at 79 (stating that until PHA complied with "its own grievance procedure," the defendant was "entitled to continue her tenancy"). The *Bin* court reiterated that ruling in dicta. 260 P.3d at 902 (noting obligation to comply with "grievance procedures before terminating a tenancy"); Both courts recognized failure to follow grievance procedures as a defense to an unlawful detainer action.[7] No court has recognized a standalone cause of action arising from a PHA's failure to follow its own policies. Moreover, no court has recognized an LEP policy as part of a PHA's grievance procedures. HUD regulations on grievance procedures do not mandate that those procedures include LEP policies. SHA did not include its Translation Policy in its grievance procedures or incorporate them into its tenant leases.

Plaintiffs' motion for summary judgment states no other statutory or common law basis for their cause of action to enforce SHA's Translation Policy. Their reply brief belatedly offers two theories of relief. First, they argue that 42 U.S.C. § 1437c-1(l) gives them a right to sue SHA for not following its Translation Policy. Second, they argue that SHA's translation practices violate the Fair Housing Act ("FHA").

Plaintiffs' own agreement dictates that the court cannot consider their belated invocation of 42 U.S.C. § 1437c-1(l) and the FHA. Plaintiffs stipulated that the court could dismiss any claim they did not raise in their summary judgment motion, an agreement that applies to each of these contentions.

Even if Plaintiffs had not promised to raise their arguments in their initial motions, their belated arguments would not succeed. The first statute on which they rely, 42 U.S.C. § 1437c-1(l)(1), provides as follows: "In providing assistance under this

_____

[7] In both of her grievance hearings, Ms. Bin argued that SHA could not evict her because it had not provided Somali translations of various grievance documents. In the hearings and in the state court proceedings that arose from them, the hearing officers and courts declined to address this contention, resolving the dispute on other grounds. *See, e.g.*, *Bin*, 260 P.3d at 902.

ORDER – 22

subchapter, a public housing agency shall comply with the rules, standards, and policies established in the public housing agency plan of the public housing agency approved under this section."  Even assuming that the Translation Policy is part of an SHA "agency plan" subject to the statute, Plaintiffs fail to establish (or even attempt to establish) that the statute gives anyone a private right of action.  To the contrary, the statute envisions that HUD itself will respond to any complaint about a PHA that is not in compliance with its agency plan.  42 U.S.C. § 1437c-1(l)(1).  So far as the court is aware, no court has ever found a private right of action to enforce this statute.  *Cf. Copeland v. United States*, 622 F. Supp. 2d 1347, 1352 (S.D. Fla. 2008) (noting that HUD, not the district court, must determine whether a PHA complies with its plan).

Although there is no dispute that the FHA creates a private right of action, Plaintiffs have no more success with a FHA claim based on SHA's translation practices. Plaintiffs rely on 42 U.S.C. § 3604(b), which makes it unlawful to discriminate "in the terms, conditions, or privileges of sale or rental of a dwelling . . . because of race, color, religion, sex, familial status, or national origin."  They contend that by failing to provide translations of grievance documents, SHA discriminates against its tenants on the basis of their national origin.  Plaintiffs' FHA claim goes far beyond a plea that SHA comply with its Translation Policy.  If Plaintiffs are correct, every landlord in the United States who fails to provide translations of eviction documents to a tenant with limited English skill has violated the FHA.  Plaintiffs concede that SHA's translation practices are not intentionally discriminatory, a concession that obligates them to prove that the practices have a disparate impact on tenants on the basis of their national origin.  *See Ojo v. Farmers Group*, 600 F.3d 1205, 1207 (9th Cir. 2010) (noting that 42 U.S.C. § 3604(b) "has been interpreted to prohibit not just intentional discrimination but also actions that have a discriminatory effect based on race [or national origin] (disparate-impact discrimination)").  But a plaintiff advancing a FHA disparate-impact claim must make a

ORDER – 23

prima facie case by showing that an "outwardly neutral practice[]" has a "significantly adverse or disproportionate impact" on persons in a protected class. *Pfaff v. HUD*, 88 F.3d 739, 745 (9th Cir. 1996). A plaintiff must offer actual proof of a disparate impact; mere inference is insufficient. *Gamble v. City of Escondido*, 104 F.3d 300, 306 (9th Cir. 1997) (affirming summary judgment where plaintiff "presented no statistics or other proof demonstrating that [defendant's] practices have a significantly adverse or disproportionate impact" on a protected class). Plaintiffs have offered no proof of the disparate impact of SHA's grievance document translation practices. Even if they had, SHA can avoid liability on a disparate impact claim by showing a legitimate nondiscriminatory reason for its policies. *Ojo*, 600 F.3d at 1207; *see also Affordable Hous. Dev. Corp. v. City of Fresno*, 433 F.3d 1182, 1195 (9th Cir. 2006) (recognizing municipality's judgment as to best allocation of funds as a legitimate nondiscriminatory basis for a decision). If Plaintiffs wished to advance an FHA claim based on the remarkable proposition that a landlord must translate eviction-related documents for every tenant with limited English proficiency, they should have begun much sooner than their final brief on these summary judgment motions.

For all of these reasons, the court concludes that Plaintiffs have no viable claim based on SHA's failure to comply with its Translation Policy or its failure to translate grievance documents. The court suggests no opinion on whether SHA actually complies with its Translation Policy, whether the Translation Policy complies with the LEP Guidance, or whether SHA's current translation practices amount to good policy.

**C.    Ms. Bin Owes No Back Rent Accruing Prior to February 2010.**

Ms. Bin's long-running dispute with SHA has spawned two grievance hearings and rulings from the King County Superior Court and Washington Court of Appeals. That dispute has illustrated almost every SHA practice that Plaintiffs have challenged in this lawsuit. SHA first formalized its dispute with Ms. Bin in July 2009, when it gave her

ORDER – 24

notice that it intended to evict her for failing to pay about $2,300 in rent.  The version of the notice in the record is muddled and perhaps incomplete, but it suggests that SHA believed that Ms. Bin owed more rent than she had paid because she had failed to disclose that her husband was living with her, a disclosure that would have increased her rent.  Ms. Bin requested a grievance hearing.  After SHA's hearing coordinator scheduled a grievance hearing, she requested a continuance for reasons related to her pregnancy.  The hearing coordinator granted the continuance, but rescheduled the hearing for a date when Ms. Bin's attorney could not be present.  The hearing coordinator denied Ms. Bin's request for another continuance.  Ms. Bin appeared for a September 2009 hearing and asked the hearing officer for a continuance.  The hearing officer took a recess, engaged in ex parte consultations with an SHA staffer, and obeyed the staffer when she told him not to grant a continuance.  He then finished the hearing and issued a decision in favor of SHA.  When SHA commenced an unlawful detainer action, Ms. Bin prevailed, convincing the trial court that the hearing officer had violated the law by, among other things, failing to make his own decision regarding her continuance request.  SHA appealed the ruling, but solely as to the trial court's award of attorney fees.  The Court of Appeals upheld the attorney fee award in the ruling this court has cited frequently in this order.  *See Bin*, *supra*.

After the trial court dismissed SHA's unlawful detainer action, SHA persisted in its efforts to evict Ms. Bin.  In a January 2010 letter, it reiterated its position from the July 2009 notice, and noted that it had refused to renew her lease in August 2009.  It clung to the accusation that she had not disclosed that her husband lived with her.  Although there is no record of Ms. Bin's request for a second grievance hearing, the parties convened a second hearing in February 2010 before a different hearing officer.

The February 2010 grievance hearing resulted in a written decision that favored Ms. Bin; the extent to which the grievance decision favored Ms. Bin is the crux of the

ORDER – 25

dispute before this court.  The decision, dated February 24, 2010, culminated in eight "Conclusions of Law."  Feb. 24 Decision at 9-11.[8]  Two of them were as follows:  "Ms. Bin owes no back rent for the period July[] 2005 through February[] 2007;" and "Because SHA seeks no back rent for any other period, Ms. Bin owes no other back rent."  *Id.* at 11.

The grievance decision explains in detail the complicated history that led to its conclusions.  To summarize, SHA contended that Ms. Bin had lied when she claimed that her husband did not live with her between July 2005 and February 2007.  It also claimed that she lied about her husband moving in with her in February 2007.  No one disputes that SHA calculates rent based on the total income of a household's residents, and that the income of Mr. Aden (Ms. Bin's husband) would have made a difference in SHA's rent calculation.  SHA also claimed that once it had established that Mr. Aden lived with Ms. Bin, he refused to provide necessary information about his income, including his 2007 and 2008 tax returns.  The hearing officer's decision took a dim view of SHA's allegations.  It found that Ms. Bin had not lied about anything and that SHA had made a host of administrative errors.  The decision noted that SHA had not, at the hearing, requested a "specific amount of back rent."  Feb. 24 Decision at 9.  It noted that as of the prior grievance hearing, SHA had requested about $5,900 in back rent from July 2005 through 2007.  *Id.*  SHA currently requests more than $15,000 in back rent, much of it for periods prior to February 2010.  Carter Decl. (Dkt. # 134).

The parties' positions about the import of the February 24 decision are straightforward.  Ms. Bin contends that the conclusion that she "owes no other back rent" means that as of February 2010, she owed SHA no back rent.  SHA contends that the conclusion merely means that the hearing officer made no conclusions about back rent other than the rent Ms. Bin allegedly failed to pay from July 2005 to February 2007.

[8] The February 24, 2010 Decision is at Exhibit 11 to Plaintiffs' counsel's declaration.  Dkt. # 123.

ORDER – 26

Each position has its merits.  Ms. Bin's interpretation is consistent with the plain language of the hearing officer's conclusions.  It is also reasonable to conclude that because the parties' rent dispute was ongoing, the hearing officer intended to completely resolve it, at least through the date of the hearing.  Moreover, the hearing officer ordered SHA to "cease attempting to terminate Ms. Bin's lease and to evict Ms. Bin based upon the events of 2005 and 2006," and directed the parties to "complete [income] recertification procedures for the family and procedures to add Mr. Aden to the lease." Feb. 24. Decision at 11.  If the hearing officer had intended to permit SHA to assess a new formulation of Ms. Bin's unpaid rent prior to the hearing based on the results of the recertification, she likely would have said so.  Weighing in SHA's favor is that the hearing officer found that Mr. Aden's failure to provide his 2007 and 2008 tax returns was "not relevant to th[e] hearing," suggesting that she left open the possibility that SHA could reassess Ms. Bin's pre-2010 rent after obtaining those returns.  *Id.* at 10.

The court concludes that SHA may not challenge the plain language of the conclusions of the grievance decision.  If the issue before the court were the best interpretation of the February 24 decision, this would be a closer case.  But that issue is not before the court.  HUD's grievance regulations dictate that a hearing officer's decision is "binding on the PHA" unless the PHA Board of Commissioners determines and promptly notifies the tenant that the decision "is contrary to applicable Federal, State, or local law, [or] HUD regulations . . . ."  24 C.F.R. § 966.57(b)(2).  No one disputes that SHA's Board of Commissioners made no such determination, prompt or otherwise, after the February 24 decision.  HUD regulations ensure that a tenant cannot lose her right to judicial review by virtue of an adverse grievance decision.  24 C.F.R. § 966.57(c).  The lack of a similar protection for the PHA leads the court to conclude that if SHA wished to ignore or challenge the decision on Ms. Bin's grievance, it was obligated to preserve that right by notifying Ms. Bin in compliance with the regulations.  Because SHA did not

ORDER – 27

preserve its right to challenge the grievance decision in court, the court adopts Ms. Bin's interpretation, which is consistent with the plain language of the relief the hearing officer rewarded.

The court accordingly concludes that as of February 24, 2010, Ms. Bin owed no back rent, and SHA is prohibited from assessing back rent prior to that date regardless of the results of the recertification process.  Because the court concludes that the only issue properly before it is the enforcement of the grievance decision, the court makes no findings as to what rent Ms. Bin owes or has paid since February 24, 2010.

## IV.    PERMANENT INJUNCTION

The court issues this permanent injunction in conjunction with its rulings in Plaintiffs' favor on their claims arising from HUD's grievance regulations.  This permanent injunction extends the preliminary injunction the court previously ordered, but adds provisions to effectuate the court's rulings today.  The new provisions obligate SHA to ensure that its hearing officers address requests for continuances in accordance with this order and to consider the input of resident organizations before appointing new hearing officers.  The court reiterates its assessment of irreparable harm and the relevant equitable factors from its February 2011 order.  *See Amoco Prod. Co. v. Vill. of Gambell*, 480 U.S. 531, 546 n.12 (1987) ("The standard for a preliminary injunction is essentially the same as for a permanent injunction with the exception that the plaintiff must show a likelihood of success on the merits rather than actual success."); *see also eBay Inc. v. MercExchange, L.L.C.*, 547 U.S. 388, 391 (2006) (stating four requirements for permanent injunction).  No party has argued that the court incorrectly assessed the harm to Plaintiffs or the equitable factors in its prior order.

Accordingly, the court permanently enjoins SHA as follows:

1) SHA's hearing officers must consider and resolve legal arguments presented at grievance hearings.

ORDER – 28

2) SHA hearing officers must have the training and experience to consider and resolve legal arguments.  The court makes no more detailed suggestion as to what training or experience is necessary, and specifically declines to require SHA to use attorneys as grievance officers.

3) SHA must, within 60 days of this order, develop rules that permit hearing officers to decide any *disputed* request for a change to the scheduled time or location of a grievance hearing.  Those rules must permit the hearing officer to grant or deny those requests without requiring the personal appearance of the tenant.

4) SHA must consult with resident organizations before selecting any future hearing officer.  The court makes no ruling as to which organizations of SHA tenants qualify as "resident organizations."  It rules, however, that SHA must at least consult with the Joint Policy Advisory Council.

5) SHA must, within 60 days of this order, develop written rules to govern consultation with resident organizations and must distribute them to all resident organizations.

## V. CONCLUSION

For the reasons stated above, the court GRANTS in part and DENIES in part the cross-motions regarding Defendants' grievance procedures.  Dkt. ## 120, 127.  The court DENIES Plaintiffs' motion regarding Defendants' policies for tenants with limited English proficiency (Dkt. # 121) and GRANTS Defendants' cross-motion on the same topic (Dkt. # 130).  The court GRANTS Plaintiffs' motion regarding Plaintiff Khadija Bin's rent obligations (Dkt. # 122), and DENIES Defendants' motion on the same topic (Dkt. # 132).

The clerk shall enter a judgment that incorporates this ruling as well as the permanent injunction above.  That judgment resolves only claims and defenses of the

ORDER – 29

Resident Action Council, Khadija Bin, the Seattle Housing Authority, and its director. All other plaintiffs resolved their claims prior to judgment. Because Plaintiffs' summary judgment motions requested no relief against Defendants Lawrence Weldon and Weldon Mediation Services, Inc., the court dismisses them from this suit. The court also dismisses any claim or issue it did not resolve in this order, in accordance with the parties' stipulations.

DATED this 31st day of October, 2012.

The Honorable Richard A. Jones
United States District Court Judge

ORDER – 30